IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| v. | CASE NO. 3:26-CR-548-B |
| JAMEL ALLEN SMALL (09) | |

**DEFENDANT JAMEL ALLEN SMALL'S OPPOSITION TO GOVERNMENT'S MOTION TO REVOKE THE NDGA RELEASE ORDER**

Following a lengthy hearing in Georgia, the Magistrate Judge determined that defendant Jamel Allen Small should be released on a set of conditions that would reasonably assure his appearance and protect the community. On top of the standard conditions and an unsecured $25,000 appearance bond, Small was ordered to submit to supervision by Pretrial Services, continue or actively seek employment (he has a job waiting for him), surrender any passport (and not obtain a passport or other international travel document), reside at an address provided to Pretrial Services, avoid contact with any co-defendant or unindicted co-conspirator, remove any firearms (done), limit alcohol consumption, not take drugs, submit to GPS monitoring (and pay its costs), limit travel to the Northern District of Georgia and the Northern District of Texas (only for court-related obligations), not open any new bank accounts or lines of credit without prior approval, not use the Telegram application on any device, and allow a search of devices to ensure he does not have access to the Telegram platform (hereinafter, the "NDGA Conditions"). (*See* Exh. A.)

The magistrate judge set those conditions because of Small's substantial ties to the

Atlanta area, large amount of family and community support, a clear and defined path to employment while this case is pending, lack of any criminal history, and that Small is a "role model" to his two sons. (Dkt. 106, Exh. 25 at 53:19-54:6.) But even though the NDGA Conditions are more stringent than several other defendants who appear to be much more significantly involved in the alleged scheme and who have been released without objection or appeal, the government is now asking this Court to second-guess the Magistrate Judge and order Small detained pending trial. This Court should **deny** the government's motion and order Small immediately released on the NDGA Conditions or any other conditions the Court believes are appropriate. In support thereof, Small respectfully shows the Court as follows.

## BACKGROUND

This is a white-collar bank-and-wire fraud case involving 14 defendants. There are no allegations of violence as to any defendant. Instead, the indictment generally alleges a scheme in which certain defendants (not Small) used corporate insiders to obtain access to bank accounts and improperly divert funds. (*See generally* Dkt. 1.) About half the defendants are described as "orchestrators and facilitators," and they maintained a list of identities, accessed accounts, traveled all over the United States, impersonated people at banks and other businesses, diverted funds from bank accounts, and shared in the proceeds. (Dkt. 1 ¶¶ 9-15.) Each of those defendants – Numbers 1 through 7 – have appeared in this case. Of those seven, four of them were detained and the other three were released on conditions that the government did not appeal.

At least four additional defendants were corporate insiders at either AT&T or a financial institution. (Dkt. 1 ¶¶ 18, 20-22.) Each of those defendants is alleged to have abused insider positions at various corporate entities by providing, among other things, real-time access to account codes and ways around security features while bank takeovers were happening and money was being diverted. Each of those defendants likewise was released on bond.[1]

Small is neither a "orchestrator and facilitator" or a corporate insider. Instead, Small is described as a "counterfeit document vendor." (Dkt. 1, ¶ 17.) Small is charged with conspiracy (Count 1) and wire fraud (Count 9). The conspiracy count describes a series of "plays," which are specific instances of the orchestrators and facilitators taking over a bank account and diverting funds. (*See* Dkt. 1, ¶¶ 29-93.) Small is only described in two of the plays and then only to the extent that someone ordered an identification card from him. (*See* Dkt. 1, ¶¶ 56-57 & 87-88.) There are no allegations that Small was involved in compromising accounts, taking over accounts, entering banks, communicating with corporate insiders, traveling to meet anyone, receiving money from a compromised account or a coconspirator, stealing identities, or even possessing the so-called "Morris Spreadsheet" that allegedly contained identities.

## <u>ARGUMENT AND AUTHORITIES</u>

This Court reviews the NDGA Conditions *de novo* but is free to consider the

---

[1] As of the filing of this Response, two defendants – Defendant Nos. 8 and 10 – have not been apprehended and thus their identities remain under seal. It is not readily clear from the indictment what role Defendant 8 or Defendant 10 played in the alleged scheme.

evidence presented at the detention hearing or anything additional presented by the parties. Under the Bail Reform Act, "release is the default, and detention is ordered only when it is shown that the defendant poses a sufficiently high and unmitigable risk." *United States v. Garner*, --- F. Supp. 3d, 2026 WL 2855758, *9 (N.D. Texas Aug. 26, 2026); *see United States v. Byrd*, 969 F.2d 106, 109 (5th Cir. 1992) ("There can be no doubt that this Act clearly favors nondetention."). Defendants, like Small, are presumed innocent until conviction beyond a reasonable doubt at trial and thus "detention prior to trial or without trial is the carefully limited exception." *United States v. Salerno*, 481 U.S. 739, 755 (1987).

**1. Small's strong family ties to the Atlanta community, where he supports his wife, her children, and his elderly parents, and his specific and defined employment show that he is not a flight risk.**

Small is not a flight risk and if the Court has any concern that he is, the NDGA Conditions provide the appropriate reasonable assurance that he will appear in Court and answer the charges against him. *See United States v. Fortna*, 769 F.2d 243, 250 (5th Cir. 1985). Small grew up in Atlanta and has lived there generally his entire life. He and his wife, Tiffany, have been married for eight years. Together, they are raising Tiffany's two sons, Carson and Caleb (ages 14 and 15), from a prior relationship. Small is actively involved in the boys' lives, views each as his children, and they view him as their dad. One of the boys (Carson) is autistic, on an Individualized Education Plan ("IEP") at school, and Small actively attends every parent-teacher conference. Attached as Exhibit B is a letter from Carson where he notes that he always will need his dad's "advice,

encouragement, and support" and that his dad helped improve his reading level from second grade to ninth grade. (Small's support also extends to the basketball court, where Carson recently made the high school team.) Attached as Exhibit C is a letter from Small's other son, Caleb, who likewise reflects that Small "helped him get back on track with [his] academics" and that "because of [Smalll's] support and encouragement [Caleb has] started taking school more seriously, and [he is] now in honors classes." Caleb is also an athlete, running track, and he notes that "having someone in the stands and cheering for me and showing interest in something I care about makes me feel supported." (Exh. C.) Small also assists with providing care for his mother, Laquita ("Polly"), who has dementia. Attached as Exhibit D is a letter from his mother.

For a long time, Small and Tiffany lived at a property on Will Lee Road owned by Small's mother and sister. That property had been in the Small family for a long time, dating back to Small's grandparents. Hardly an extravagance, despite the government's suggestion of large profits, the Will Lee Road property is a three-bedroom, two-bath house (1,380 square feet) with an estimated Zillow price of approximately $250,000. (Exh. E.) With Small's mother's and sister's desire to sell the property, Small and Tiffany recently relocated to a new property located in Fairburn, Georgia, likewise modest with an estimated Zillow price of approximately $300,000, for which Small and Tiffany are paying $2,000 per month in rent. (Exh. F.)

Small is also surrounded by extended family and friends in the Atlanta area who are prepared to support him and make sure he complies with all conditions in the NDGA

Release Order or any other condition the Court believes is appropriate. Attached as Exhibit G is a letter from Small's godmother, Karin Lei Foy, who notes that she has known him for 14 years, finding him to be "an upstanding young man, a devoted husband to Tiffany, and a caring, committed father." Ms. Foy further notes that Small has provided "stability" to his children's lives, takes his responsibilities seriously and provides "consistent care" and a "secure home for his family." (Exh. G.) Attached as Exhibit H is a letter from Marcus Dortch, another close friend, who views Small as a "role model" and someone who had motivated Marcus "to be great and work hard." Marcus also commented on Small's role as a father: "He has supported them, built them up, and show nothing but love to them." (Exh. H.)

Small's sister, Ciera Strickland, echoed many of those same thoughts in her letter, attached hereto as Exhibit I. She noted that Small doesn't just show up for his family, but he has been there for Ciera's family as well, noting that he makes every effort "to be present for important moments in [her] son's life, including sporting events, birthdays, and other special occasions." (Exh. I.) Ciera also committed that she understands the "importance of following all court instructions and appearing for trial as required." (Exh. I.) To that end, while she will support him in a positive manner, she will also "hold[] him accountable for returning to court and fulfilling his legal obligations." (Exh. I.) She noted: "My support for my brother does not mean that I believe he should be excused from his responsibilities. Rather, I believe in supporting him while encouraging accountability, responsibility, and better decisions. I am committed to reminding him of

the importance of this process and making sure he understands that returning to court is an obligation that must be taken seriously." (Exh. I.)

Small also has a job waiting for him in Atlanta upon his release pending trial in this case from an employer who is well aware of the allegations against him. Undersigned counsel has discussed with Shawn McLean of Savannah Distribution Company (based in Atlanta, Georgia), who has multiple opportunities waiting for Small, including as a Shuttle Driver or working in a warehouse. Mr. McLean is fully aware of the charges against Small and is supportive of him and his employment while on pretrial release.

Small's wife Tiffany also provided a letter (attached hereto as Exhibit J) and intends to travel from Atlanta to Dallas for the hearing on Tuesday, October 27. Tiffany understands the seriousness of the charges and importance of complying with any release order. She notes that he "will not be returning to an environment without structure, guidance, or accountability." (Exh. J.) Instead, as reflected in the other letters of support, Small would be going home to a "village" that "is prepared to stand beside him while respecting every requirement established by the Court." (Exh. J.) That includes "the importance of court appearances, communication with counsel, compliance with pretrial supervision, travel restrictions, and any other conditions the Court may impose." (Exh. J.) Not only will the "village" support him, but Tiffany is also "personally committed to supporting his compliance with those requirements." (Exh. J.) She, along with the rest of the family, "will encourage him to face [this case] responsibly, respectfully, and with

the dignity the Court deserves." (Exh. J.)

In sum, Small is surrounded by people who understand the seriousness of the charges against him and will support him while facing these charges. He has a demonstrated and concrete connection to his community and no reason to leave it. He has no criminal history and certainly no allegations of violence in his past. He will scrupulously abide by the NDGA Conditions or any other condition the Court believes is necessary.

**2. The government cannot show by clear and convincing evidence that Small is a danger to the community.**

At the hearing in Georgia, the government disavowed any suggestion that Small is a danger to the community, a concession the Magistrate Judge rightly agreed with. (Dkt. 106 at Exh. 25 @ 17:17-19, 50:8-12.) Now, on appeal, the government has changed its position, apparently contending that Small is a financial danger due to his alleged creation of fake IDs. (Dkt. 106 at 15-16.) "The government's burden is much higher when it is instead seeking detention based on danger. There, the BRA requires the government to show by clear and convincing proof that no conditions will reasonably assure the safety of another person or the community." *Garner*, --- F.4th ---, 2026 WL 2855758 at *10. The government cannot meet that burden here. *First*, any concern this Court may have about Small's alleged creation of identification cards is mitigated, if not eliminated, by the government's seizure of any computers, printers, or other equipment at

his places of residence that arguably could be used to create the same.[2] *Second*, in its motion, the government points to Small's purported "willingness to steal other individuals' identities" as a basis for why he is an economic danger. (Dkt. 106 at 15.) Yet that fact is nowhere in the government's indictment presented to the Grand Jury and return on a finding of probable cause. Small is not alleged to have stolen any identities, maintained the so-called "Morris Spreadsheet," or even possessed it. He is not alleged to have impersonated people at the banks, diverted funds from accounts, or shared in those proceeds. *Third*, the government contends that it had been investigating Small for many years. But if this was a clear and convincing case of financial danger to the community, presumably the government would have taken immediate action to stop him from continuing to engage in those acts. The government's evidence falls woefully short of establishing that Small is an on-going danger to himself or the community, financial or otherwise.

### 3. The government's lack of objection to less-stringent release orders for more substantively involved defendants cuts against ordering Small held pending trial.

The government's effort to seek Small's detention must be considered in light of its position on other defendants in this case.

Defendant Renaldo Santez Gaines's alleged involvement in the bank-takeover scheme described in the indictment is significantly more serious than anything alleged

[2] The government cites to Dkt. No. 26 in *United States v. Dieye*, Case No. 3:26-CR-381-L (N.D. Texas) to suggest that the term "dangerousness" in the Bail Reform Act is not limited to crimes involving violence. (Dkt. 106 at 15.) That docket entry is not available to the public and presumably under seal.

against Small. And yet the government consented to his release under a set of conditions that are less stringent than what are reflected in the NDGA Release Order. Gaines is described in the indictment as an "orchestrator and facilitator" of the scheme. (Dkt. 1, ¶ 13.) Among other things, he is alleged to have impersonated a victim by linking the victim's phone and email address to Gaines's phone, so that Gaines could provide other co-conspirators with one-time alerts from financial institutions. (Dkt. 1 ¶¶ 80-81.) He further travelled across state lines, meeting with other co-conspirators in New York where he and others called a financial institution and attempted to impersonate a victim and convince the financial institution to wire $2 million overseas. (*Id.* ¶ 83.) He allegedly did similar things with a telephone company and traveled again across state lines to meet coconspirators to effectuate the scheme. (*See id.* ¶¶ 89, 92.)

Gaines was arrested in Washington D.C. and the government moved for detention. (Dkt. 62 at 2.) The magistrate judge denied the motion, releasing Gaines on conditions that included GPS monitoring, just as ordered in this case. (*Id.* at 4-7.) The government did not appeal the order to this Court. (Dkt. 52 at 1.) When Gaines appeared in the Northern District of Texas, the local magistrate judge's order did not include the GPS monitoring provision. (Dkt. 52 at 1-2.) The government and Gaines jointly moved to amend the conditions, where the government made clear that "[b]ut for the GPS monitor," the government would have appealed the release order. (Dkt. 52 at 2.)

Even more telling is defendant Alphonso Brndon Seke-Horton, also described as an "orchestrator and facilitator" of the scheme. (Dkt. 1, ¶ 14.) According to the

indictment, Seke-Horton was involved in numerous of the "plays" in different roles, including meeting with coconspirators, receiving stolen funds, taking orders from Dieye, and providing bank account balances. (Dkt 1, ¶¶ 30-55.) The government did not move to detain Seke-Horton. (Dkt. 104.) Instead, the government agreed to his release on conditions that, relevant here, only included a travel restriction to the state of Texas and a prohibition on opening financial accounts or helping someone else to do so. (*Id.*) Seke-Horton also does not have any sort of electronic monitoring condition. (*Id.*) The NDGA Release Order recommends more stringent conditions for Small. (*See* Exh. A.)

Similarly, defendant Terry Leon Daniels, another "orchestrator and facilitator" of the scheme, was released without objection from the government on similar conditions to that of Seke-Horton. (Dkt. 31.) Yet Daniels is alleged to have used another person's identity to attempt to obtain financing for a vehicle, posed as a victim at a bank so he could be added as an authorized signer on the account, and then made multiple withdrawals from the victim's bank account. (*See* Dkt. 1, ¶¶ 45, 51-55.)

**4. Each of the factors under 3142(g) supports the NDGA Release Order.**

Section 3142(g) sets forth several factors for the Court to consider in determining appropriate conditions. Each supports release of Small pursuant to the NDGA Release Order or any other condition the Court believes is appropriate.

***Nature and Circumstances of the Offense***. No question, the Court must look at the nature and circumstances of the offense. *See* 18 U.S.C. § 3142(g)(1). But that also means the Court must look at the nature and circumstances of Small's role in that offense.

As described above, there are no allegations that Small was involved in compromising accounts, taking over accounts, entering banks, communicating with corporate insiders, traveling to meet anyone, receiving money from a compromised account or a coconspirator, stealing identities, or even possessing the so-called "Morris Spreadsheet" that allegedly contained identities. What is alleged is that Small was a vendor who was asked, on two occasions, to provide a product and yet has now been tagged with knowledge that he knew exactly what someone was going to do with it. When properly considered, Small's role in the offense is significantly different than the nature and circumstance of the offense itself.

Furthermore, the government suggests that Small is "[a]rmed with the PII of thousands of individuals, synthetic identities, and the knowledge of how to manufacture" them, he is "but one counterfeit ID away from disappearing." (Dkt. 106 at 12.) Talk about an overreach. There is no allegation that he was ever "armed" with thousands of identities and certainly not the so-called Morris Spreadsheet. Moreover, whatever was in Small's possession was seized by the government including any equipment that could arguably be used to manufacture an identification care. There is also no doubt that Gomez, Seke-Horton, or Daniels, all out on conditions of release, could find a way to obtain a fake ID – you don't have to make it yourself; they are readily available for purchase on the internet or otherwise. And one fake ID isn't a one-way ticket to Malaysia.[3] If the potential that someone could get a fake ID is enough to warrant

[3] Indeed, when codefendant Dieye was about to board a plane to Malaysia on a one-way ticket, the

detention, then it is hard to see how any defendant could ever get released, and yet numerous defendants are released every day on conditions, who then do not procure one fake ID and immediately take off. In addition, Small does not have a passport (*see* Dkt. 106, Exh. 25 at 55:5-11) and the NDGA Conditions restrict his travel to NDGA and NDTX and require GPS monitoring. (Exh. A at 3.)

This factor weighs in favor of release.

***Weight of the Evidence***. Next, the Court can look at the weight of the evidence, but the government rightly concedes that this factor is "of least importance" in determining whether conditions can be set to reasonably assure a defendant's appearance or the safety of the community. The volume of the government's discovery (4.5 TB) or the number of Telegram messages (hundreds of thousands between codefendants) seems hardly probative of anything without knowing which portions, if any, related to Small.

Next, the government's suggestion that Small is sitting on piles of cash is unsupported speculation at best. They contend that his "messages and audio recordings" suggest he has made "nearly $1,000,000" but then point to a one-page piece of paper that, perhaps, documents bank accounts with less than 50,000, if they have anything to do with this case at all. There's no basis to say he has lived extravagantly. (*See* Dkt. 106, Exh. 21.) And as noted above, Small, his wife, and his two sons have lived in modest homes, one of which had been in the family for years and the other a recent move where he and

---

government had no problem immediately indicting him on visa fraud and detaining him pending the return of the indictment in this case. (*See* Dkt. 23 at 2, *in* Case No. 3:26-CR-381, *United States of America v. Muhamed Dieye* (N.D. Texas).)

his wife are paying rent. (*See* Exhibits B & C.)

The government also points to the fact that Small had a Florida license. Small did, in fact, obtain a license in Florida using the address of his godmother. A records check on the Florida website shows that it is a valid Florida license, not a fake one. If he was such a prolific creator of fake IDs, he would have had no reason to get a validly issued Florida license using the address of his godmother.

This factor weighs in favor of release.

***History and Characteristics of the Person***. For all the reasons already discussed, Small's history and characteristics strongly support release. (*See supra* Section I.) And the government's additional arguments on this point don't sway that conclusion. As for the suggestion that he doesn't have legitimate income, before his arrest he was involved in breeding dogs, certainly a legal endeavor. Moreover, the government's references to his supposed proceeds from the alleged scheme are unsupported with any financial analysis or bank records. And even if he did make "nearly $1,000,000" there's no suggestion any of that money remains. In fact, the one-page piece of paper identified by the government describes bank accounts with balances under $30,000. (*See* Dkt. 106, Exh. 21.)

The suggestion that his wife "participated in, or at least been complicit in" the alleged conduct is rank speculation at best, just as the bare footnote alluding to "additional, sensitive information" that, in the government's mind, makes Small's homelife "unstable." (Dkt. 106 at 14 & n.3.) Both unsupported statements run directly

counter to the numerous people who showed up for him in Atlanta at the initial detention hearing, including his wife, his two sons, his mother, his stepfather, and his father-in-law. (*See* Dkt. 106, Exh. 25 at 24:4-22.) In fact, the magistrate judge specifically noted the support in determining that release was appropriate: "But I want to tell you the thing that strikes me the most about this case is all those people sitting in the back of the courtroom because you have ties to this community. You have a great deal of family support, multigenerational." (Dkt. 106, Exh. 25 at 53:19-22.) And the government's bald assertion of instability at home is likewise belied by the numerous letters of support that have been submitted to the Court.

Lastly, the government suggests that there are "active warrants" for Small's arrest in Georgia. (Dkt. 106 at 15.) To start, no warrant has been produced or identified to counsel, and nothing in the pretrial report suggested there were any active warrants. No case was identified, no warrant attached to the government's motion. Moreover, this issue was discussed during the Georgia detention hearing where appointed counsel there introduced records showing that the whatever the issues are involving a former partner they have been resolved. (*See* Dkt. 106, Exh. 25 @ 20:23-21:19; *see also* Exh. K.) If there were valid warrants at play at the time of Small's hearing in Georgia (on September 25, 2026), then he would not have been granted release on conditions. And if these supposed charges have arisen just in the last four weeks while Small has been in custody, that certainly cuts against the legitimacy of the allegations.

This factor weighs heavily in favor of release.

***Danger to the Community***. For all the reasons already discussed, Small is not a danger – economic or otherwise – to the community such that conditions cannot be imposed to address any concern. (*See supra* Section II.) The NDGA Release Order prohibits him from opening new bank accounts of lines of credit without prior approval. Even though the use of Telegram, in and of itself, is perfectly legal, Small likewise agreed not to use it at all as well as to allow a search of any device to make sure he does not have access to that platform.

This factor weighs in favor of release.

## CONCLUSION

For the foregoing reasons, Small respectfully asks that this Court deny the government's motion and order him released pursuant to the NDGA Release Order or any other conditions the Court believes are appropriate.

Dated: October 26, 2026

Respectfully submitted,

***/s/ J. Nicholas Bunch***

J. Nicholas Bunch
State Bar No. 24050352
HAYNES AND BOONE, LLP
2801 North Harwood Street, Suite 2300
Dallas, Texas 75201
Tel: (214) 651-5000
Fax: (214) 651-5940

**ATTORNEY FOR DEFENDANT JAMEL ALLEN SMALL**

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing document was served on all counsel of record via email on October 26, 2026.

*/s/ J. Nicholas Bunch*
J. Nicholas Bunch

# EXHIBIT A

# UNITED STATES DISTRICT COURT

for the

Northern District of Georgia

FILED IN OPEN COURT
U.S.D.C. - Atlanta

SEP 25 2026

KEVIN P. WEIMER, Clerk
By: [signature] Deputy Clerk

United States of America
v.

JAMEL ALLEN SMALL
*Defendant*

Case No. 1:26-MJ-1009-JKL

## ORDER SETTING CONDITIONS OF RELEASE

IT IS ORDERED that the defendant's release is subject to these conditions:

(1) The defendant must not violate federal, state, or local law while on release.

(2) The defendant must cooperate in the collection of a DNA sample if it is authorized by 34 U.S.C. § 40702.

(3) The defendant must advise the court or the pretrial services office or supervising officer in writing before making any change of residence or telephone number.

(4) The defendant must appear in court as required and, if convicted, must surrender as directed to serve a sentence that the court may impose.

The defendant must appear at: ______________________________
*Place*

______________________________

on ______________________________
*Date and Time*

If blank, defendant will be notified of next appearance.

(5) The defendant must sign an Appearance Bond, if ordered.

## ADDITIONAL CONDITIONS OF RELEASE

Pursuant to 18 U.S.C. § 3142(c)(1)(B), the court may impose the following least restrictive condition(s) only as necessary to reasonably assure the appearance of the person as required and the safety of any other person and the community.

IT IS FURTHER ORDERED that the defendant's release is subject to the conditions marked below:

( ☐ ) (6) The defendant is placed in the custody of:
Person or organization ______
Address *(only if above is an organization)* ______
City and state ______ Tel. No. ______
who agrees to (a) supervise the defendant, (b) use every effort to assure the defendant's appearance at all court proceedings, and (c) notify the court immediately if the defendant violates a condition of release or is no longer in the custodian's custody.

Signed: ______ ______
*Custodian* *Date*

( ☒ ) (7) The defendant must:
( ☒ ) (a) submit to supervision by and report for supervision to the U.S. ~~Probation Office~~ Pretrial Services,
telephone number 404-215-1950, no later than before leaving the courthouse.
( ☒ ) (b) continue or actively seek employment.
( ☒ ) (c) ~~continue or start an education program.~~
( ☒ ) (d) surrender any passport to: U. S. Probation Office
( ☒ ) (e) not obtain a passport or other international travel document.
( ☒ ) (f) abide by the following restrictions on personal association, residence, or travel: Reside at address provided to U.S. Pretrial Services and do not change your address or telephone number without written Pretrial Services pre-approval
( ☒ ) (g) avoid all contact, directly or indirectly, with any person who is or may be a victim or witness in the investigation or prosecution, including: any and all co-defendants and/or unindicted co-conspirators
( ☐ ) (h) get medical or psychiatric treatment: ______
( ☐ ) (i) return to custody each ______ at ______ o'clock after being released at ______ o'clock for employment, schooling, or the following purposes: ______
( ☐ ) (j) maintain residence at a halfway house or community corrections center, as the pretrial services office or supervising officer considers necessary.
( ☒ ) (k) not possess a firearm, destructive device, or other weapon. * must remove all firearms by 4pm 9/25/26
( ☒ ) (l) not use alcohol ( ☐ ) at all ( ☒ ) excessively.
( ☒ ) (m) not use or unlawfully possess a narcotic drug or other controlled substances defined in 21 U.S.C. § 802, unless prescribed by a licensed medical practitioner.
( ☐ ) (n) submit to testing for a prohibited substance, if required by the pretrial services office or supervising officer. Testing may be used with random frequency and may include urine testing, wearing a sweat patch, submitting to a breathalyzer, and/or any other form of prohibited substance screening or testing. The defendant must not obstruct, attempt to obstruct, or tamper with the efficiency and accuracy of substance screening or testing of prohibited substances.
( ☐ ) (o) participate in a program of inpatient or outpatient substance use treatment, if directed by the pretrial services office or supervising officer.
( ☐ ) (p) participate in the remote alcohol testing program using continuous electronic alcohol testing and comply with its requirements as directed, including not consuming alcohol.
( ☐ ) pay all or part of the cost of remote alcohol testing, including equipment loss or damage, based upon your ability to pay, as determined by the pretrial services or supervising officer.
( ☒ ) (q) participate in the location monitoring program and comply with the requirements, as directed in subsections i, ii, and iii.

i. Following the location restriction component **(check one)**:

( ☐ ) (1) **Curfew.** You are restricted to your residence every day ( ☐ ) from ______ to ______, or ( ☐ ) as directed by the pretrial services office or supervising officer; or
( ☐ ) (2) **Home Detention.** You are restricted to your residence at all times except for employment; education; religious services; medical, substance use, or mental health treatment; attorney visits; court appearances; court-ordered obligations; activities approved by the court; or essential activities approved in advance by the pretrial services office or supervising officer; or
( ☐ ) (3) **Home Incarceration.** You are restricted to 24-hour-a-day lockdown at your residence except for medical necessities and court appearances or activities specifically approved by the court; or
( ☒ ) (4) **Stand-Alone Monitoring.** You have no residential component (curfew, home detention, or home incarceration) restrictions. However, you must comply with the location or travel restrictions as imposed by the court. **Note:** Stand-alone monitoring should be used in conjunction with global positioning system (GPS) or virtual mobile application technology.

## ADDITIONAL CONDITIONS OF RELEASE

(ii) submit to the following location monitoring technology **(check one)**:

( ☐ ) (1) Location monitoring technology as directed by the pretrial services or supervising officer; or
( ☒ ) (2) GPS; or
( ☐ ) (3) Radio Frequency; or
( ☐ ) (4) Voice Recognition; or
( ☐ ) (5) Virtual Mobile Application. You must allow the pretrial services or supervising officer to conduct initial and periodic inspections of the mobile device and mobile application to verify that 1) the monitoring software is functional, 2) the required configurations (e.g., locational services) are unaltered, and 3) no efforts have been made to alter the mobile application.

(iii) ( ☒ ) pay all or part of the cost of location monitoring, including equipment loss or damage, based upon your ability to pay, as determined by the pretrial services or supervising officer

( ☒ ) (r) report as soon as possible, to the pretrial services or supervising officer, every contact with law enforcement personnel, including arrests, questioning, or traffic stops.

( ☒ ) (s) Defendant's travel is restricted to the Northern District of Georgia, unless the supervising officer has approved travel in advance. and my travel to N.D Texas for court-related obligations

(t) Defendant shall not open any new bank accounts or lines of credit without prior approval

(u) may not use the telegram app on any device and he must allow a search of devices to ensure he ~~has~~ does not have access to the telegram platform.

## ADVICE OF PENALTIES AND SANCTIONS

TO THE DEFENDANT:

YOU ARE ADVISED OF THE FOLLOWING PENALTIES AND SANCTIONS:

Violating any of the foregoing conditions of release may result in the immediate issuance of a warrant for your arrest, a revocation of your release, an order of detention, a forfeiture of any bond, and a prosecution for contempt of court and could result in imprisonment, a fine, or both.

While on release, if you commit a federal felony offense the punishment is an additional prison term of not more than ten years and for a federal misdemeanor offense the punishment is an additional prison term of not more than one year. This sentence will be consecutive (*i.e.*, in addition to) to any other sentence you receive.

It is a crime punishable by up to ten years in prison, and a $250,000 fine, or both, to: obstruct a criminal investigation; tamper with a witness, victim, or informant; retaliate or attempt to retaliate against a witness, victim, or informant; or intimidate or attempt to intimidate a witness, victim, juror, informant, or officer of the court. The penalties for tampering, retaliation, or intimidation are significantly more serious if they involve a killing or attempted killing.

If, after release, you knowingly fail to appear as the conditions of release require, or to surrender to serve a sentence, you may be prosecuted for failing to appear or surrender and additional punishment may be imposed. If you are convicted of:

(1) an offense punishable by death, life imprisonment, or imprisonment for a term of fifteen years or more – you will be fined not more than $250,000 or imprisoned for not more than 10 years, or both;
(2) an offense punishable by imprisonment for a term of five years or more, but less than fifteen years – you will be fined not more than $250,000 or imprisoned for not more than five years, or both;
(3) any other felony – you will be fined not more than $250,000 or imprisoned not more than two years, or both;
(4) a misdemeanor – you will be fined not more than $100,000 or imprisoned not more than one year, or both.

A term of imprisonment imposed for failure to appear or surrender will be consecutive to any other sentence you receive. In addition, a failure to appear or surrender may result in the forfeiture of any bond posted.

### Acknowledgment of the Defendant

I acknowledge that I am the defendant in this case and that I am aware of the conditions of release. I promise to obey all conditions of release, to appear as directed, and surrender to serve any sentence imposed. I am aware of the penalties and sanctions set forth above.

[signature]
*Defendant's Signature*

*City and State*

### Directions to the United States Marshal

( ✓ ) The defendant is ORDERED released after processing. ** The court will stay the order until 9/28/26 @ noon to allow the government to seek an appeal
(   ) The United States marshal is ORDERED to keep the defendant in custody until notified by the clerk or judge that the defendant has posted bond and/or complied with all other conditions for release. If still in custody, the defendant must be produced before the appropriate judge at the time and place specified.

Date: 9/25/26

[signature]
*Judicial Officer's Signature*

JOHN K. LARKINS III, U.S. MAGISTRATE JUDGE
*Printed name and title*

# EXHIBIT B

I'll always need my dad advice, encouragement support, and those moments where I can just be myself around my dad. and my dad is a important person in my life I hope I can give my dad as many reasons to smile and feel loved as my dad deserve, he helped me get my reading up from a 2 grade level to 4th grade

# EXHIBIT C

To Whom It May Concern

I am writing this letter to explain the important role my dad has played in my life and the positive impact he has had on me as a young man. He has helped me in ways that I will never forget.

My dad has helped me get back on track with my academics and sports. Because of his support and encouragement, I have started taking school more seriously, and I am now in honors classes. This is something I am proud because I know I am working toward a better future for myself. He has helped me understand that school is important and that I need to stay focused on my grades and goals. He encourages me to do my best and reminds me that I am capable of doing great things especially if I put my mind to it.

He has also been with me when it comes to track. There have been times when my biological father did not show up to my track meets, but my dad did. He made the effort to come and support me, and that has meant alot to me. Having someone in the stands

and cheering for me and showing interest in something I care about makes me feel supported.

Thank you for reading,

Caleb Ellison

# EXHIBIT D

Making Plans For What is in
My Heart.
Celebrating The Lessons of
Living and Loveng James and Polly
Jame/ Mommy and Daddy.
This is a Father Love, Do you
Realize that our Father Love you
like that?
No Matter how Well you Were
Nurtured there Would Still be
areas that Challenged you.
even after all that has happened
To you. We Loves you Still.

Polly

James

# EXHIBIT E

Buy Rent Sell Get a mortgage Find an agent Zillow Manage rentals Advertise Get help Sign in

Search Updates Favorites Plan Inbox

Back to search Save Share More




Zestimate®
**$251,900**
[redacted] Will Lee Rd, Atlanta, GA 30349

**3** beds **2** baths **1,380** sqft

Est. refi payment: **$1,636/mo** Refinance your loan

SingleFamily | Built in 1985 | 1.76 Acres Lot
$251,900 Zestimate® | $183/sqft | $1,901 Estimated rent

**Get a cash offer in 3 minutes**

Find out how much your home could sell for in as little as 3 minutes with a no-obligation cash offer.

**Estimated market value**
**$251,900**
What is this number?

Start now

Claim home

## Home value

| Zestimate® | Estimated sales range | Rent Zestimate® |
|---|---|---|
| $251,900 | $209,000 - $292,000 | $1,901/mo |

**Help make your Zestimate® more accurate**

Edit home facts

# EXHIBIT F

Buy Rent Sell Get a mortgage Find an agent Zillow Manage rentals Advertise Get help Sign in

Search Updates Favorites Plan Inbox

Back to search

Save Share More




See all 20 photos

Zestimate®

# $298,800

[redacted]Rudder Cir, Fairburn, GA 30213

4 beds 3 baths -- sqft

Est. refi payment: **$1,941/mo** Refinance your loan

Single Family Residence | Built in ---- | -- sqft lot

$298,800 Zestimate® | $--/sqft | $2,232 Estimated rent

## Get a cash offer in 3 minutes

Find out how much your home could sell for in as little as 3 minutes with a no-obligation cash offer.

**Estimated market value**

**$298,800**

What is this number?

Start now

Claim home

## Home value

| Zestimate® | Estimated sales range | Rent Zestimate® |
|---|---|---|
| **$298,800** | **$278,000 - $320,000** | **$2,232/mo** |

**Help make your Zestimate® more accurate**

Edit home facts

# EXHIBIT G

30 Karin Lei Foy

MON 9:49 AM

To Whom It May Concern:

I am writing this character reference in support of Jamel Small, whom I have known for 14 years. During that time, I have come to know him as an upstanding young man, a devoted husband to Tiffany, and a caring, committed father.

One of the strongest reflections of Jamel's character is the stability he has brought to his children's lives. He has taken his responsibilities seriously, providing consistent care and helping create a more secure home for his family. I have witnessed his dedication to raising his children and being present for those who depend on him.

Over the years, I have also watched Jamel face repeated attacks on his character and accusations that I believe to be false. Through these difficult experiences, he has carried himself with dignity and integrity. His response to adversity has deepened my respect for him.

I understand that Jamel is now facing legal circumstances involving his association with others. While I

Aa

Karin Lei Fey

home for his family. I have witnessed his dedication to raising his children and being present for those who depend on him.

Over the years, I have also watched Jamel face repeated attacks on his character and accusations that I believe to be false. Through these difficult experiences, he has carried himself with dignity and integrity. His response to adversity has deepened my respect for him.

I understand that Jamel is now facing legal circumstances involving his association with others. While I cannot speak to the legal merits of his case, I can speak to the character I have personally observed over 14 years. I respectfully ask that his conduct, commitment to his family, and the stability he provides his children receive thoughtful consideration.

Thank you for your time and consideration.

Sincerely,

Karin Lei Harris
813-510-9000
Karinlovesmk@gmail.con

# EXHIBIT H

[redacted]

---------- Forwarded message ---------
From: **Marcus Dortch** <marcus@outsource.net>
Date: Tue, Oct 20, 2026 at 7:00 PM
Subject: Jamel Small's Character Letter
To: Marcus Dortch <marcus@outsource.net>, Tmsmall415@gmail.com <Tmsmall415@gmail.com>

Dear Judge and the Jury,

My name is Marcus Dortch and Jamel Small is my very close cousin. So close that I could call him my other brother. I wanted to reach out on his behalf and vouch for his character, perseverance, growth, and the love we have for him as family.

Jamel has been a role model for me growing up. Just as I said earlier, we are extremely close. He always took the time to hang with me when I was younger. Those times meant the world to me especially since he would motivate me to be great and work hard. Watching him as I was growing up there were a few things I observed. Jamel was always working hard and spending time with us as a family. I depended on his motivation and support dearly as I went through high school, college, and now in my adult life. He never missed an opportunity to support me. Jamel attended majority of my basketball games from high school to college and my local adult summer leagues. He was at both of my graduations, and we would speak all the time. I wouldn't be where I'm at without his love and support.

Which leads me to his wife Tiffany, and his sons Carson and Caleb. Tiffany and the boys are my family, and they mean the world to me. Tiffany has been nothing but a blessing to Jamel and vice versa. I have watched them grow as a couple, get married, and start life as a family. I was glad to be a part of their world. I have seen how much this has affected them as a whole and it pains me to watch them go through this. Jamel has been an amazing father figure to the boys. He has supported them, built them up, and shown nothing but love to them. It's been amazing to watch them grow up under my cousin's leadership. I know he means the world to them, and it reminds me of when I was growing up. I can't imagine Jamel not being able to be there to continue to mold and support them just as he did for me. It's been amazing to see

them to go from boys now transitioning into young men. A positive role as a husband is so important in marriage and of course, just as important as the role of a father the life of their kids. Jamel has done nothing but pour into them and I can't imagine a life where they don't have him around to continue guiding them.

I hope this letter reaches the hearts of everyone that is reading or listening. Jamel is loved by all. He has been a positive light to his family and community. Please take all I'm saying into consideration and allow him to come home to his family.

Sincerely,

Marcus Dortch

**Marcus Dortch**
Sales and Account Manager
Cell – 770-349-5285

Direct – 404-334-4012
outsource.net

outsource
Low Voltage & Electrical Workforce

# EXHIBIT I

To Whom It May Concern,

I am writing this letter in support of my brother, Jamel Small, to speak about his character, the positive role he plays in our family, and the importance of his presence in our lives.

Jamel is someone who holds a special place in our family. He is more than just my brother; he is a son, a husband, a father, a family member, and an active uncle to my son. He makes an effort to be present for important moments in my son's life, including sporting events, birthdays, and other special occasions. His presence means a great deal to my son and to me as his mother. He has shown that family is important to him, and I value the relationship and bond they share.

I understand the seriousness of his current legal situation, and I do not take the court process lightly. I recognize the importance of following all court instructions and appearing for trial as required. I am willing to support my brother in a positive and responsible way while also holding him accountable for returning to court and fulfilling his legal obligations. I will encourage him to take this matter seriously, keep track of his court dates, communicate with his attorney, and make every necessary effort to appear for trial as directed by the court.

My support for my brother does not mean that I believe he should be excused from his responsibilities. Rather, I believe in supporting him while encouraging accountability, responsibility, and better decisions. I am committed to reminding him of the importance of this process and making sure he understands that returning to court is an obligation that must be taken seriously.

I respectfully ask that you consider his family ties, his relationship with my son, and the positive role he plays in our family when reviewing this letter. His presence is meaningful to us, and I believe that having the support of family members who are willing to encourage accountability can make a difference.

Thank you for taking the time to consider my statement and for allowing me the opportunity to share my perspective on my brother's character and the support system he has within our family.

Respectfully,
Ciera Strickland

# EXHIBIT J

**Character Reference and Family Support Letter**

**Dear Your Honor:**

My name is Tiffany Small, and I am writing to you not only as the wife of Jamel Allen Small, but as a mother, a woman who has endured some of the most difficult seasons of her life, and someone who has personally witnessed the character of the man who now stands before your Court. I understand that my husband is facing serious federal charges, and I do not write this letter to minimize the seriousness of these proceedings or to interfere with the judicial process. I write because I believe it is important for the Court to understand the man I know, the family he has helped build, and the lives that are deeply affected by his absence. **Your Honor, my husband is so much more than the allegations currently associated with his name.**

Before Jamel became my husband, I was a mother doing everything within my power to raise two young boys while navigating circumstances that were emotionally exhausting. There came a point when their biological father made it clear that his continued involvement was tied to whether I remained married to Jamel or returned to that previous relationship. That was an incredibly painful reality to face as a mother. My children did not deserve to feel that the love and presence of a father depended upon the choices their mother made in her personal life. But where there was uncertainty, Jamel provided stability. Where there was disappointment, he offered reassurance. And where there was an absence, he stepped forward without hesitation. He did not have to love my children as his own. He did not have to accept the responsibilities that came with raising two boys who were not biologically his. Yet he chose to do so, not for recognition, not because anyone required it of him, but because that is the kind of man he has shown himself to be.

He has been present for their accomplishments, their disappointments, their emotional struggles, and the everyday responsibilities that come with raising children. He has helped provide them with structure, guidance, encouragement, and the example of a man who shows up for his family.

Our son Carson has a disability that requires additional attention, understanding, and educational support. Jamel has never treated those needs as a burden. He has been present at school meetings, participated in conversations concerning Carson's education, and stood beside me as we advocated for the services and opportunities Carson deserves.

For a child who requires additional support, consistency and the presence of trusted adults can make a tremendous difference. Jamel has helped provide that consistency. His

involvement is not limited to what happens inside our home; it extends into our children's education, development, and future.

To my boys, Jamel is not simply their mother's husband. He is a father figure who has demonstrated through his actions what unconditional love, commitment, and responsibility look like.

Even though his children were snatched from him, all due to a disgruntle kids mom, he still never allowed that to be the reason he gave up. He has been fighting to be in his children lives for over 8 years now and she has placed several false charges on him that he has beat EACH TIME.

Your Honor, I also want to share something deeply personal.

There have been seasons in my life when the emotional weight of my circumstances became almost unbearable. I have struggled with depression, and there were moments when my thoughts became so dark that I questioned whether I wanted to continue living.

I do not share this for sympathy. I share it because I want the Court to understand the depth of the support my husband has provided.

During some of my most difficult moments, Jamel listened when I needed to speak, comforted me when I felt overwhelmed, reminded me of my worth when I struggled to recognize it myself, and encouraged me to keep going when life felt too heavy.

He reminded me that my children needed me, that my life had purpose, and that difficult seasons did not have to define my future.

My husband has been a source of emotional stability, encouragement, and strength during times when I desperately needed those things. His love has helped me find hope again, and his presence has made a meaningful difference in my ability to navigate life's challenges.

I am grateful to him for that in ways that words may never fully express.

But Jamel's compassion does not begin or end with me and our children.

I have also witnessed his devotion to the women who helped raise him. He has taken an active role in caring for his mother, offering support and assistance when she has needed him. His concern for her well-being has been especially important during times of illness and uncertainty.

I also witnessed the love and dedication he showed his grandmother. He helped care for her throughout her later years and remained committed to her needs until the day she passed away.

Caring for an aging loved one requires patience, sacrifice, compassion, and a willingness to put someone else's needs before your own. These are qualities that cannot be measured by a title, a financial statement, or a courtroom allegation. They are demonstrated through consistent actions, often when no one else is watching. Those are the actions I have witnessed from my husband.

Your Honor, I know that love alone does not determine what happens in a courtroom. I understand that the law must be respected, that the judicial process must take its course, and that the Court has an obligation to consider the matters before it carefully.

However, I respectfully ask that my husband not be viewed solely through the allegations against him. The man described in legal proceedings is not the entirety of the man who has shared his life with me, helped raise my children, cared for his family, and stood beside us through extraordinary challenges.

I am not asking the Court to disregard evidence or excuse wrongdoing. I am asking that the Court also consider his humanity, his demonstrated family commitments, and the people who know him beyond these proceedings.

I believe in my husband. I believe in the good I have personally witnessed in him. And I believe he deserves the opportunity to be evaluated fairly, with the presumption of innocence to which he is entitled.

If the Court grants him the opportunity to return home while these proceedings continue, I want Your Honor to know that he will not be returning to an environment without structure, guidance, or accountability.

He has a village. And that village is prepared to stand beside him while respecting every requirement established by this Court.

We understand the importance of court appearances, communication with counsel, compliance with pretrial supervision, travel restrictions, and any other conditions the Court may impose.

I am personally committed to supporting his compliance with those requirements. Our family will help him maintain his schedule, arrange transportation when necessary, and make certain that his court obligations remain a priority.

When the time comes for trial or any other required appearance, we will do everything within our ability to ensure that Jamel is present, prepared, and on time. His family will not encourage him to avoid this process. We will encourage him to face it responsibly, respectfully, and with the dignity the Court deserves.

I recognize that the responsibility for complying with the Court's orders ultimately belongs to Jamel, and I believe he understands that responsibility.

Your Honor, I wish there were words powerful enough to explain how deeply I love this man.

Jamel is my husband, my partner, my closest friend, and the person with whom I have chosen to build my future. Our marriage is not perfect, and neither of us claims to be without flaws. But the foundation of our relationship has been love, loyalty, perseverance, and the commitment to continue choosing one another even when life becomes difficult.

I have watched this man love children he did not bring into this world. I have watched him care for family members who could no longer care for themselves. I have watched him stand beside me during medical challenges, emotional hardship, and some of the most difficult experiences of my life.

Those moments are not allegations. They are experiences I have lived. They are memories my children carry. They are examples of the character I have personally witnessed.

And while I cannot speak for every decision my husband has ever made, I can speak truthfully about the man he has been to our family.

I love my husband with a depth that is difficult to put into words. But my request to this Court is not based on love alone. It is based on the years of commitment, compassion, responsibility, and family involvement that I have personally observed.

I respectfully ask Your Honor to consider the stability of our home, the needs of our children, his responsibilities toward his mother, and the strong network of family support available to him when determining whether he may be released under appropriate conditions while his case proceeds.

My children deserve the continued presence of a man who has consistently shown up for them. His mother deserves the support of a son who has cared for her. And I hope to have the opportunity to stand beside my husband as we face this difficult chapter together.

I am not asking the Court to see Jamel through my love for him alone. I am asking the Court to see that there is a life, a family, and a history of meaningful responsibility beyond the charges written on paper.

Thank you, Your Honor, for taking the time to read my words, for considering the perspective of a wife and mother, and for allowing me the opportunity to share the person I know my husband to be.

With the utmost respect for this Court and the judicial process,

**Tiffany Small**

*Tiffany Small*

(470) 656-5642

10/19/2026

# EXHIBIT K

Outlook

RE: Scan from Xerox 5

**From** Jayson Shannon <Jayson_Shannon@fd.org>
**Date** Thu 9/24/2026 1:44 PM
**To** Thomas Hawker <Thomas_Hawker@fd.org>

Hey Tom,

The only case I was able to find was SUCV2022000729 which is a case brought forward by Dept Human Services. In August of 2023 there was an order for incarceration filed but it was lifted with the final order on March 17, 2025. I've requested a copy of the order from Newton county.

Show 10 entries

| | Code | Description | Filing Date | Party Name | Offense | Comments |
|---|---|---|---|---|---|---|
| ➔ | CRT | CERTIFICATE OF SERVICE | 06/30/2023 | | | CERTIFICATE OF SERVICE |
| ➔ | ORD | ORDER | 08/10/2023 | | | TEMPORARY CONTEMPT OR AND ORDER FOR INCARCERATION |
| ➔ | CRT | CERTIFICATE OF SERVICE | 08/23/2023 | | | CERTIFICATE OF SERVICE |
| ➔ | MOT | MOTION | 03/09/2025 | | | MOTION TO VACATE ARRES PROVISIONS OF PRIOR INCARCERATION ORDER(S) MOTION FOR FINAL ORDER |
| ➔ | DISP | FINAL DISPOSITION | 03/17/2025 | | | |
| ➔ | ORD | ORDER | 03/17/2025 | | | FINAL ORDER VACATING ARREST PROVISION OF PRI INCARCERATION ORDER(S) |
| ➔ | DSP | DISPOSITION | 03/17/2025 | | | CASE DISPOSITION FORM |
| ➔ | CRT | CERTIFICATE OF SERVICE | 04/05/2025 | | | CERTIFICATE OF SERVICE |

**From:** Thomas Hawker <Thomas_Hawker@fd.org>
**Sent:** Thursday, September 24, 2026 11:55 AM
**To:** Jayson Shannon <Jayson_Shannon@fd.org>
**Subject:** Fw: Scan from Xerox 5

Can you check the open warrant on him. Page 4, it says Covington, GA. Is it from the dismissed/nolle prossed cases?

T

**From:** Xerox5 <FDGAN_Xerox5@fd.org>
**Sent:** Thursday, September 24, 2026 11:24 AM
**To:** Thomas Hawker <Thomas_Hawker@fd.org>
**Subject:** Scan from Xerox 5

Please open the attached document. It was scanned and sent to you using PrimeLink.

Number of Images: 5
Attachment File Type: PDF

Device Name: Xerox5
Device Location: 14th floor - open copy area